<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

RAFIEEK GRAHAM,                     :
                                    :   Civil Action No. 10-5027 (SRC)
                 Plaintiff,         :
                                    :
                                    :
            v.                      :   **OPINION**
                                    :
DR. MERRIL MAIN, et al.,            :
                                    :
                 Defendants.        :


**APPEARANCES:**

        RAFIEEK GRAHAM, Plaintiff <u>pro</u> <u>se</u>
        #00083
        East Jersey State Prison, Special Treatment Unit
        CN 905, 8 Production Way
        Avenel, New Jersey 07001

**CHESLER**, District Judge

        Plaintiff, Rafieek Graham, an involuntarily committed person

pursuant to the Sexually Violent Predator Act ("SVPA"), <u>N.J.S.A.</u>

30:4-27.24, <u>et</u> <u>seq.</u>, seeks to bring this action <u>in</u> <u>forma</u>

<u>pauperis</u>.  Based on his affidavit of indigence, the Court will

grant plaintiff's application to proceed <u>in</u> <u>forma</u> <u>pauperis</u>

("IFP") pursuant to 28 U.S.C. § 1915(a) (1998) and order the

Clerk of the Court to file the Complaint.

        At this time, the Court must review the Complaint and

plaintiff's many addendums, pursuant to 28 U.S.C. § 1915(e)(2),

to determine whether the action should be dismissed as frivolous

or malicious, for failure to state a claim upon which relief may

be granted, or because it seeks monetary relief from a defendant who is immune from such relief. For the reasons set forth below, the Court concludes that this action should be dismissed with prejudice for failure to state a claim upon which relief may be granted.

## I.  <u>BACKGROUND</u>

Plaintiff, Rafieek Graham ("Graham"), brings this civil rights action, pursuant to 42 U.S.C. § 1983, against the following defendants: Mrs. Shantay Brame Adams, Assistant Director of the Special Treatment Unit ("STU") at the East Jersey State Prison ("EJSP"); Dr. Merril Main, Director of the EJSP STU; Ms. Roxanne Vega, Psychologist at the EJSP STU; Mrs. Jackie Ottino, Program Coordinator at the EJSP STU; Michael Vanpelt, Program Coordinator at the STU Annex; John Main, Chief Executive Officer of mental Health at the Ann Klein Forensic Center; and Dr. Kevin Enright, Psychiatrist at the EJSP STU. (Complaint, Caption and ¶¶ 4b-4h). The following factual allegations are taken from the Complaint, and are accepted for purposes of this screening only. The Court has made no findings as to the veracity of plaintiff's allegations.

The Court notes that this is the second action filed by Graham with regard to his civil confinement at the STU in EJSP. His first action, <u>Graham v. Christie, et al.</u>, Civil No. 10-2010 (KSH), was dismissed without prejudice by Opinion and Order

issued by the Honorable Katharine S. Hayden on or about October 18, 2010.  Graham filed this instant Complaint on or about September 25, 2010, before his first action was dismissed.[1] Additionally, Graham filed yet a third action on or about October 26, 2010, shortly after his first action was dismissed.  See Graham v. Sharp, et al., Civil No. 10-5563 (SRC).

In this second action, Graham continues to complain about his confinement at the EJSP STU, and what he alleges are unconstitutional restrictions and conditions placed on him as a civilly committed person.  He generally complains that he has suffered mental abuse and harassment by the treatment team staff at the EJSP STU since he was transferred there in May 2010, mainly because they are treating him like a prisoner and not a civilly committed person.

For instance, Graham first alleges that, on September 24, 2010, defendant Dr. Enright "caused [plaintiff] to be separated from [his] support group, leaving [Graham] mentally alone.  By telling the treatment team staff to place [Graham] on a unit where [he is] not liked to greatly satisfy his own personal issues, disregarding the fact that this facility 'suppose' to be a therapeutic institution not a prison system for problem prisoners."  (Compl., ¶ 6 Statement of Claims).

--------

[1]  The Complaint is dated and signed by plaintiff on September 25, 2010; however, it was not received by the Clerk of the Court until September 29, 2010 as noted on the docket report.

Graham seeks to be transferred to a "federally funded facility" and to be compensated for his mental anguish and deliberate indifference by the named defendants.  He seeks an unspecified amount in punitive damages. (Compl., ¶ 7).

On October 14, 2010, Graham filed his first of many notices of addendum to his Complaint.  (Docket entry no. 2).  In this first addendum, Graham alleges that there are three different addresses used for the residents at the EJSP STU, and that mail and packages are sent to a different location than where the residents are confined.[2]  When Graham questioned the use of different addresses, he complains that, on May 14, 2010, he was "indirectly threatened" by the New Jersey Department of Human Services ("NJDHS") Administrator and the New Jersey Department of Corrections ("NJDOC") Administrator that plaintiff would be placed on Modified Activities Program ("MAP") status.  Graham states that he continued to file complaints and grievances.  (See October 14, 2010 Addendum at Docket entry no. 2).

Graham further alleges that, on May 12, 2010, he was placed on the South Unit because of his treatment refusal, although he states that he never refused treatment.  On September 23, 2010, Lieutenant Jones moved Graham's support group on the South Unit,

---

[2]  Graham attaches a memo dated May 14, 2010, from Assistant Superintendent Steve Johnson, which shows that a different address is used for receipt of first class mail and packages from home apart from the address for packages from UPS and Federal Express.

4

but the next day, defendant Adams moved the support off the unit for "personal reasons."  (See id.).

Graham also complains that, since May 2010, he has been placed in a cell that leaks water from the ceiling when it rains and is infested with gnats.  Although he files grievances about these conditions, he alleges that nothing is done.  (Id.).

On October 1, 2010, Lt. Jones informed plaintiff that the NJDHS staff told Jones to separate Graham and the support group Graham had been with for ten years.  On October 25, 2010, Graham went to the yard and was verbally harassed by corrections officers and staff.  Graham alleges that on September 28, 2010, defendants Adams and Ottino told officers to harass plaintiff about his "gender of life" by calling plaintiff a "homo" and "fag."  (Id.).

On September 24, 2010, Graham alleges that he was threatened with "treatment probation."  Graham states that on October 1, 2010 he was still housed on South Unit labeled as a segregated unit, for treatment refusals, and as a result, he has not been able to go to groups or participate in any therapeutic programs.  Graham contends that he has not been in any trouble for over seven years.  (Id.).

On October 4, 2010, Graham attended "group 7" run by group therapist Roxanne Vega.  Graham alleges that Vega became "aggressive" and yelled at plaintiff not to tell another NJDHS

5

staff member that Graham's family is his own business.  Graham states that Vega threatened to put Graham on MAP status.  He claims that psychiatric treatments are being used for disciplinary purposes.  (Id.)

On October 7, 2010, Director Main and Superintendent Johnson ordered that no kitchen worker on "A" unit can go to the kitchen. On October 8, 2010, an exterminator came to spray the unit for an outbreak of bed bug infestation.  The exterminators come four days each week to fumigate the unit.  (Id.)

On October 9 and 10, 2010, Graham attended yard movement to be with his support group, but they were harassed by officers because of their gender and lifestyle.  Graham complains that he has been humiliated and mentally tortured.  Graham alleges that Officer Ware stated to him that she did not understand why plaintiff and his support group were being harassed.  (Id.).

On October 14, 2010, the Court received a motion filed by Graham seeking a temporary restraining order directing defendants not to retaliate against plaintiff by confiscating his court papers or placing plaintiff on MAP status.  (See Docket entry no. 3).  Graham alleges that he has been banned from law library materials and has been placed under prison policy guidelines and procedures even though he is not a prisoner.  He also alleges that he has been threatened with MAP status if he does not follow the NJDHS "way."  He also complains that he has been separated from his "mental support."  (Id.).

On October 19, 2010, the Court received a second addendum to plaintiff's Complaint. (Docket entry no. 4). Graham alleges that on October 14, 2010, defendant Vega dropped plaintiff's treatment from Phase 3 to Phase 2 with the possibility of taking plaintiff's job. Graham states that he has had above average attendance in group and passed two polygraph tests. Graham was told that he had missed four group sessions although Graham contends that he missed only two because of family problems. He alleges that the drop in his treatment phase was retaliatory because of the lawsuit he filed. (Id.).

Graham further alleges that Vega told him that Graham manipulated Lt. Jones to put plaintiff on the South Unit to be with his support group. Graham was then moved to the West Unit where he does not get along with the other residents on the theory that a conflict would occur and Graham could be placed on MAP status. (Id.).

On or about October 28, 2010, Graham wrote another addendum to his Complaint. (Docket entry no. 5). Graham continues to recite perceived grievances in his treatment at the EJSP STU. On October 22, 2010, he states that he was locked in his cell while it was searched and electronic equipment was taken. He states that he remained locked in his cell for seven hours before being allowed to leave his cell. Graham attaches the contraband seizure receipt he received on October 22, 2010, which shows that three remotes, one X-box controller, one portable DVD player, a

7

three-plug adapter and a Kinyo surge protector box were confiscated because these items pose " a threat to the security or orderly operation of the correctional facility."  He complains that a civilly committed person should not be subjected to the same rules as prisoners, more particularly, he should not be subjected to cell searches and pat searches.  (Id.).

Graham also alleges that the confiscation of his electronic equipment was part of a campaign of harassment by correctional officers against him.  His cell was searched on October 19, 2010, when no other residents' cells were searched.  Graham does not identify the other forms of harassment but states that it happens continuously and that he has filed grievances about it to no avail.  He states that the harassment causes him mental anguish and makes him feel like a prisoner, disrupting his treatment.  (Id.).

Graham next alleges that, on October 27, 2010, his group therapist, Vega, gave him a memo, which he attaches to the addendum, stating that Graham was on treatment refusal status.  Graham alleges that Vega did this because he refuses to write down what she wants him to write.  (Id.).

On November 8, 2010, Graham wrote to the Court seeking leave to amend his Complaint to add defendants.  (Docket entry no. 7).  He again wrote to the Court on November 13, 2010, to complain that the defendants are limiting his therapy/treatment movements by placing him on treatment refusal status.  (Docket entry no.

8).  He states that he has never refused treatment.  Graham further complains that he believes that his mail is being monitored.  He states that, on November 13, 2010, he received an Order dated November 9, 2010 in his earlier action, Civil No. 10-2010 (KSH), which was dismissed without prejudice for failure to state a claim.  He states that he re-submitted that case in October but it was filed under a new case number, Civil No. 10-5563 (PGS).[3]  It is not clear from the letter as to the relief, if any, he seeks in this regard.  However, he does state that he has been denied access to the law library.  (Id.).

On November 22, 2010, this Court received plaintiff's amended Complaint.  (Docket entry no. 9).  Graham names the following new defendants: Sgt. Susan Smith, SCO J. Maloney, SCO L. Rodriguez, SCO T. Walker, SCO M. Kimball, Sgt. J. Smith, Chief Cathy Buchanan, and Administrator M.W. Yatauro.  (Am. Compl., Caption and ¶¶ 4b-4i).  He complains that these defendants have either condoned, allowed or participated in the constant verbal harassment he has had to endure since he has been at the EJSP STU.  The verbal harassment consists of sexual "gay" jokes and being called a "fag" or "homo."  (Id., ¶¶ 4b-4i, 6).  He names two specific instances of alleged harassment.  First, on November 12, 2010, defendant Kimball came to the South Unit during open recreation period and "took [plaintiff's] mental support out of

_____

[3]  The case was re-assigned to this Court and is now Civil No. 10-5563 (SRC).

9

session."  The next incident occurred on November 18, 2010, when Sgt. Maloney went to the East Unit to tell the officers on duty to "watch and monitor" Graham because defendant Adams allegedly told them to harass plaintiff.  (<u>Id</u>., ¶ 6).  Graham asks to be transferred to another facility.  (<u>Id</u>., ¶ 7).

On November 8, 2010, Graham wrote yet another letter to the Court, asking that it be considered an addendum to his Complaint. (Docket entry no. 10).  Graham complains that, on November 9, 2010, he was told that South Unit is segregated from open recreation with other units by order of Clinical Director merril Main.  Graham states that his support group is housed there.  On November 10, 2010, he was subjected to a strip search after coming from the yard and before entry to the North Unit.  He claims the strip search was not performed in a private area and that the officers were verbally degrading him because of his "life gender."  (<u>Id</u>.).

On November 4, 2010, Graham alleges that the West Unit, where he is housed, was locked down and could not go to yard, which is where plaintiff meets and confides in his "mental support group."  (<u>Id</u>.).  He alleges that he was told on November 10, 2010, that defendants Main and Adams are "mentally punishing" plaintiff for incidents that occurred over eight years ago when he was housed at the Kearny facility.  Graham further alleges that he has been complaining about NJDHS harassment and

10

punishment for more than ten years but nothing is done to remedy or prevent it.  (<u>Id</u>.).

Graham further alleges that, on November 1, 2010, a memo was passed around stating that all electronic equipment would be confiscated, basically placing Graham under prison policy and guidelines even though he is a civilly committed person.  On November 12, 2010, while attending a therapy/treatment session, defendant Kimball told Graham that Director Main and Assistant Director Adams don't want Graham and his "mental support" to participate in therapy/treatment sessions together, thus causing Graham and his support to "constantly go to the yard to sleep, relax, and talk together."  (<u>Id</u>.).

On November 29, 2010, Graham submitted an amended Complaint adding the following defendants: Deputy Attorney General Mark Singer; Brian Friedman, Psychology Director at the EJSP STU; and Jennifer Velez, Commissioner of the NJDHS.  (Docket entry no. 11).  Graham complains that defendant Singer has "overlook[ed] and disregard[ed] the fact of civilly committed 'residents' being housed in a prison system."  (<u>Id</u>., at ¶ 4(b)).  Defendant Friedman allegedly has overlooked plaintiff's "untherapeutic" environment when the NJDOC terminated groups and placed civilly committed persons at EJSP under prison policy and rules.  (<u>Id</u>., at ¶ 4(c)).  Finally, Graham alleges that defendant Velez has disregarded the unsanitary conditions of EJSP and the NJDOC's placement of civilly committed persons under the "10A code",

11

causing electronic property to be confiscated, cell searches and strip searches after visitation.  (<u>Id</u>., at ¶ 4(d)).

On December 6, 2010, Graham wrote another letter to the Court seeking to add another addendum to his Complaint.  He complains that in June 2010, a staff psychologist stated to plaintiff "off the record" that plaintiff "does not belong here." But, on August 9, 2010, Graham's public advocacy attorney stopped the psychologist from testifying in court, preventing plaintiff from being released to an outpatient program.  (Docket entry no. 12-1).  Graham filed an attorney ethics grievance on October 7, 2010, which is attached to his addendum.  He also attaches a Treatment Refusal notice, dated October 8, 2010, which indicates that Graham had been placed on Treatment Probation Status, and that Graham had not complied with the recommendations at that time, prompting a Treatment Refusal Status.  (Docket entry no. 12-2).

On February 8, 2011, Graham wrote to the Court yet again, asking to add SCO K. Miller, as a defendant in this matter. Graham alleges that Miller is retaliating against plaintiff for filing a lawsuit against other workers.  In particular, Graham states that, on January 9, 2011, while plaintiff was in the yard, defendant Miller told two other residents that Graham was responsible for Miller taking the workout benches out of the yard.  Miller allegedly told the two residents to let the whole

12

population know that the "yard is getting messed up" because of
Graham and another resident.  (Docket entry no. 14).

On or about March 16, 2011, plaintiff filed an application
for appointment of pro bono counsel.  (Docket entry no. 15).

## II.   STANDARDS FOR A SUA SPONTE DISMISSAL

A district court is required to review a complaint in a
civil action where the litigant is proceeding in forma pauperis.
Specifically, the court is required to identify cognizable claims
and to sua sponte dismiss any claim that is frivolous, malicious,
fails to state a claim upon which relief may be granted, or seeks
monetary relief from a defendant who is immune from such relief,
pursuant to 28 U.S.C. § 1915(e)(2)(B).  Accordingly, because Boss
is proceeding in forma pauperis in this matter, this action is
subject to sua sponte screening for dismissal under 28 U.S.C. §
1915(e)(2)(B).

In determining the sufficiency of a pro se complaint, the
Court must be mindful to construe it liberally in favor of the
plaintiff.  See Erickson v. Pardus, 551 U.S. 89, 93-94
(2007)(following Estelle v. Gamble, 429 U.S. 97, 106 (1976) and
Haines v. Kerner, 404 U.S. 519, 520-21 (1972)).  See also United
States v. Day, 969 F.2d 39, 42 (3d Cir. 1992).  The Court must
"accept as true all of the allegations in the complaint and all
reasonable inferences that can be drawn therefrom, and view them
in the light most favorable to the plaintiff."  Morse v. Lower
Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997).  The Court

13

need not, however, credit a <u>pro</u> <u>se</u> plaintiff's "bald assertions" or "legal conclusions." <u>Id.</u>

A complaint is frivolous if it "lacks an arguable basis either in law or in fact." <u>Neitzke v. Williams</u>, 490 U.S. 319, 325 (1989) (interpreting the predecessor of § 1915(e)(2), the former § 1915(d)). The standard for evaluating whether a complaint is "frivolous" is an objective one. <u>Deutsch v. United States</u>, 67 F.3d 1080, 1086-87 (3d Cir. 1995).

A <u>pro</u> <u>se</u> complaint may be dismissed for failure to state a claim only if it appears "'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" <u>Haines</u>, 404 U.S. at 521 (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957)). <u>See also</u> <u>Erickson</u>, 551 U.S. at 93-94 (In a pro se prisoner civil rights complaint, the Court reviewed whether the complaint complied with the pleading requirements of Rule 8(a)(2)).

However, recently, the Supreme Court revised this standard for summary dismissal of a Complaint that fails to state a claim in <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937 (2009). The issue before the Supreme Court was whether Iqbal's civil rights complaint adequately alleged defendants' personal involvement in discriminatory decisions regarding Iqbal's treatment during detention at the Metropolitan Detention Center which, if true, violated his constitutional rights. <u>Id</u>. The Court examined Rule 8(a)(2) of the Federal Rules of Civil Procedure which provides

14

that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2).[4]  Citing its recent opinion in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), for the proposition that "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,' "Iqbal, 129 S.Ct. at 1949 (quoting Twombly, 550 U.S. at 555), the Supreme Court identified two working principles underlying the failure to state a claim standard:

> First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice ... .  Rule 8 ... does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.  Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not "show[n]"-"that the pleader is entitled to relief."  Fed. Rule Civ. Proc. 8(a)(2).

Iqbal, 129 S.Ct. at 1949-1950 (citations omitted).

The Court further explained that

> a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.

---

[4]  Rule 8(d)(1) provides that "[e]ach allegation must be simple, concise, and direct.  No technical form is required." Fed.R.Civ.P. 8(d).

> When there are well-pleaded factual allegations, a court
> should assume their veracity and then determine whether they
> plausibly give rise to an entitlement to relief.

Iqbal, 129 S.Ct. at 1950.

Thus, to prevent a summary dismissal, civil complaints must now allege "sufficient factual matter" to show that a claim is facially plausible.  This then "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. at 1948.  The Supreme Court's ruling in Iqbal emphasizes that a plaintiff must demonstrate that the allegations of his complaint are plausible.  Id. at 1949-50; see also Twombly, 505 U.S. at 555, & n.3; Fowler v. UPMC Shadyside, 578 F.3d 203, 210(3d Cir. 2009).

Consequently, the Third Circuit observed that Iqbal provides the "final nail-in-the-coffin for the 'no set of facts' standard" set forth in Conley v. Gibson, 355 U.S. 41, 45-46 (1957),[5] that applied to federal complaints before Twombly.  Fowler, 578 F.3d at 210.  The Third Circuit now requires that a district court must conduct the two-part analysis set forth in Iqbal when presented with a motion to dismiss:

---

[5]  In Conley, as stated above, a district court was permitted to summarily dismiss a complaint for failure to state a claim only if "it appear[ed] beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.  Id., 355 U.S. at 45-46.  Under this "no set of facts" standard, a complaint could effectively survive a motion to dismiss so long as it contained a bare recitation of the claim's legal elements.

First, the factual and legal elements of a claim should be separated.  The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. [Iqbal, 129 S.Ct. at 1949-50].  Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." [Id.]  In other words, a complaint must do more than allege the plaintiff's entitlement to relief.  A complaint has to "show" such an entitlement with its facts.  See Phillips, 515 F.3d at 234-35.  As the Supreme Court instructed in Iqbal, "[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show [n]'-'that the pleader is entitled to relief.'"  Iqbal, [129 S.Ct. at 1949-50].  This "plausibility" determination will be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

Fowler, 578 F.3d at 210-211.

This Court is mindful, however, that the sufficiency of this pro se pleading must be construed liberally in favor of Plaintiff, even after Iqbal.  See Erickson v. Pardus, 551 U.S. 89 (2007).  Moreover, a court should not dismiss a complaint with prejudice for failure to state a claim without granting leave to amend, unless it finds bad faith, undue delay, prejudice or futility. See Grayson v. Mayview State Hosp., 293 F.3d 103, 110-111 (3d Cir. 2002); Shane v. Fauver, 213 F.3d 113, 117 (3d Cir. 2000).

III.  <u>SECTION 1983 ACTIONS</u>

Graham brings this action pursuant to 42 U.S.C. § 1983.

Section 1983 provides in relevant part:

> Every person who, under color of any statute,
> ordinance, regulation, custom, or usage, of any State
> or Territory ... subjects, or causes to be subjected,
> any citizen of the United States or other person within
> the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other
> proper proceeding for redress ... .

Thus, to state a claim for relief under § 1983, a plaintiff must
allege, first, the violation of a right secured by the
Constitution or laws of the United States and, second, that the
alleged deprivation was committed or caused by a person acting
under color of state law.  <u>West v. Atkins</u>, 487 U.S. 42, 48
(1988); <u>Piecknick v. Pennsylvania</u>, 36 F.3d 1250, 1255-56 (3d Cir.
1994).

IV.  <u>THE NEW JERSEY SEXUALLY VIOLENT PREDATOR ACT</u>

The New Jersey SVPA, <u>N.J.S.A.</u> 30:4-27.24 *et seq.*, provides
for the custody, care and treatment of involuntarily committed
persons who are deemed to be sexually violent predators ("SVP").
<u>N.J.S.A.</u> 30:4-27.26.  The New Jersey Department of Corrections
("DOC") operates the facilities designated for SVPs, <u>N.J.S.A.</u>
30:4-27.34(a); and the New Jersey Department of Human Services
("DHS") provides for their treatment.  <u>N.J.S.A.</u> 30:4-27.34(b).
The SVPA was amended in 2003 to require that regulations be
promulgated jointly by the DOC and the DHS, in consultation with

of the Attorney General, taking "into consideration the rights of the patients as set forth in section ten of P.L. 1965, c. 59 (C. 30:4-24.2) ... [to] specifically address the differing needs and specific characteristics of, and treatment protocols related to, sexually violent predators." N.J.S.A. 30:4-27.34(d).

In passing the SVPA, the New Jersey Legislature made specific findings regarding SVPs. N.J.S.A. 30:4-27.25. The Legislature noted that it was necessary to modify the previous civil commitment framework and additionally separate SVPs from other persons who have been civilly committed. Id. The SVPA defines a SVP as:

> ... a person who has been convicted, adjudicated delinquent or found not guilty by reason of insanity for commission of a sexually violent offense, or has been charged with a sexually violent offense but found to be incompetent to stand trial, and suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment.

N.J.S.A. 30:4-27.26(b).

Those persons committed under the SVPA shall receive annual review hearings. N.J.S.A. 30:4-27.35. A SVP may be released from involuntary civil commitment upon recommendation of the DHS or by the SVP's own petition for discharge. N.J.S.A. 30:4-27.36.

## V.   ANALYSIS

### A.   Transfer to Prison Facility Claim

Graham again seems to reiterate his primary complaint that he has been transferred to a prison facility, as a civilly

committed person under the SVPA, and that such placement is
unconstitutional where he is subject to the prison policies in
place for the orderly operation and security of a prison
facility.  Graham raised this claim in his first action, Civil
No. 10-2010 (KSH).  The Court dismissed this claim, with
prejudice, in the Opinion and Order issued on or about October
18, 2010, based on the Supreme Court's ruling in Kansas v.
Hendricks, 521 U.S. 346 (1997).

      In Kansas v. Hendricks, the Supreme Court examined the
conditions of confinement provided by Kansas' Sexually Violent
Predator Act.  The Act called for the confinement of sexually
violent predators in a secure facility because they were
dangerous to the community.  Id., 521 U.S. at 363-64.  Pertinent
here, the Supreme Court was aware that the sexually violent
predators in Kansas were to be held in a segregated unit within
the prison system.  However, the Court noted that the conditions
within the unit were essentially the same as conditions for other
involuntarily committed persons in mental hospitals.  Moreover,
confinement under the Act was not necessarily indefinite in
duration, and the Act provided for treatment.  Id., 521 U.S. at
363, 364, 365-368.  Thus, the Supreme Court held that involuntary
confinement under Kansas' SVPA was not unconstitutional so long
as such civilly-confined persons are segregated from the general
prison population and afforded the same status as others who have
been civilly committed.  Id., 521 U.S. at 368-69.  See also

20

Seling v. Young, 531 U.S. 250, 261062 (2001)(holding same with respect to the State of Washington's SVPA).

Here, the New Jersey SVPA is essentially the same as the Kansas and Washington SVP statutes that were examined and upheld as constitutional by the Supreme Court in Hendricks and Seling, respectively.[6]  See Bagarozy v. Goodwin, Civil Action No. 08-468 (SRC), 2008 WL 4416455, *7-8 (D.N.J. Sept. 23, 2008); In re Commitment of W.Z., 173 N.J. 109, 801 A.2d 205, 211 (2002). Therefore, this Court finds that Boss' placement and confinement in a Special Treatment Unit for SVP residents that is a segregated unit in the East Jersey State Prison, does not, in and of itself, violate the U.S. Constitution's Due Process Clause or the Eighth Amendment's prohibition against cruel and unusual punishment.  Accordingly, Graham's claim that his continued confinement in a segregated unit within a prison facility is unconstitutional will be dismissed with prejudice for failure to state a cognizable claim of a constitutional deprivation.

B.  Conditions of Confinement Claim

Although plaintiff's placement in a segregated unit within a prison facility is not, in and of itself, a constitutional

---

[6]  Recently, the Supreme Court held constitutional under the Necessary and Proper Clause, a federal statute that allowed a district court to order the civil commitment of a sexually dangerous federal prisoner beyond the date the prisoner would otherwise be released.  United States v. Comstock, No. 08-1224, __ U.S. __, 130 S.Ct. 1949 (May 17, 2010).  Although these civilly committed persons remained confined at a federal prison, namely, FCI Butner, the Court did not address their place of civil confinement as being unconstitutional.

violation, Graham makes additional allegations concerning the conditions of confinement at the EJSP facility.  For instance, he complains that he is housed in a prison facility subject to restrictions.  See Youngberg v. Romeo, 457 U.S. 307, 321-22 (1982)("Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish.").

Generally, the Fourteenth Amendment requires that civilly committed persons not be subjected to conditions that amount to punishment, Bell v. Wolfish, 441 U.S. 520, 536 (1979),[7] within the bounds of professional discretion, Youngberg, 457 U.S. at 321-22.  Specifically, in Youngberg, the Supreme Court held that civilly committed persons do have constitutionally protected interests, but that these rights must be balanced against the reasons put forth by the State for restricting their liberties. Id. at 307.  The Constitution is not concerned with de minimis restrictions on patients' liberties.  Id. at 320.  Moreover, "due process requires that the conditions and duration of confinement [for civilly confined persons] bear some reasonable relation to the purpose for which persons are committed."  Seling, 531 U.S.

---

[7]  In Bell v. Wolfish, the Supreme Court held that whether a condition of confinement of pretrial detainees violated their constitutional rights turns on whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate government purpose.  441 U.S. 520, 535-39, (1979).

at 265.  While the nature of an SVP's confinement may factor in
this balance of what is reasonable, it is clearly established
that the substantive due process protections of the Fourteenth
Amendment apply to SVPs. See Andrews v. Neer, 253 F.3d 1052, 1061
(8th Cir. 2001)(applying the Fourteenth Amendment's "objective
reasonableness" standard to excessive force claims brought by
civilly committed SVPs).

Graham's main allegation with respect to the conditions of
his confinement relates to his contention that he is now housed
in a prison facility and has been treated like a prisoner and
subjected to prison rules.  For instance, he complains that his
electronic equipment was seized in October 2010, pursuant to a
policy memorandum.  Graham also complains that he has been
subjected to searches after he has come from the yard or visits.
Movement to group sessions are controlled by the prison staff,
mail is sent to a different location, and any resident who
complains will be placed in MAP status.  Graham also alleges that
the ceiling leaks when it rains, and that an exterminator comes
weekly to spray for bed bug infestation.

The Third Circuit has held that placement of a civilly
committed SVP in segregated confinement does not violate due
process unless the deprivation of liberty is in some way extreme.
See Deavers v. Santiago, 243 Fed. Appx. 719, 721 (3d Cir.

23

2007)(applying <u>Sandin v. Conner</u>, 515 U.S. 472 (1995),[8] to segregated confinement of civilly committed SVPs).  <u>See also</u> <u>Thielman v. Leean</u>, 282 F.3d 478 (7th Cir. 2002)(likewise extending <u>Sandin</u> to civil commitment settings).  Thus, Graham's general allegation that disruptive and agitative residents may be placed in MAP status, and that general movement is monitored and restricted, without more, fails to articulate a cognizable claim of constitutional magnitude, in light of <u>Deavers</u>.  Graham fails to allege any facts to show that MAP restrictions and movements within the EJSP facility are unduly extreme and unrelated to the purposes for which such restrictions are imposed.

Additionally, for the following reasons, this Court finds that Graham's complaints about the mail restrictions, searches, and confiscation of electronic devises are not extreme conditions of plaintiff's confinement as a civilly committed person, and thus, do not violate due process.

1.  *Unlawful Search Claim*

Graham alleges that he is subjected to cell searches, and a "pat down" search or a strip search when he leaves his unit at EJSP, for yard recreation or for a visit.  He also states that he was strip searched on one occasion after returning from the yard.

---

    [8]  In <u>Sandin</u>, the Supreme Court held that there was no cognizable liberty interest in freedom from additional restraint in a prison setting.  <u>See</u> 515 U.S. at 486 ("We hold that [the prisoner's] discipline in segregated confinement did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest.").

It would appear that plaintiff is asserting that as a civilly committed person, such searches are unconstitutional and violate his rights under the Fourth Amendment.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures." U.S. CONST. amend. IV.  Reasonableness under the Fourth Amendment "depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 618 (1988)(quoting United States v. Montoya de Hernandez, 473 U.S. 531, 537 (1985)).  "Thus, the permissibility of a particular practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." Id. at 619 (quotation marks and internal citation omitted).

In Hudson v. Palmer, 468 U.S. 517, 530 (1984), a prisoner argued that a cell search conducted to harass him was unreasonable because a prisoner has a reasonable expectation of privacy not to have his cell, locker, personal effects, person invaded for such a purpose. Id. at 529.  The Supreme Court rejected the claim because "prisoners have no legitimate expectation of privacy." Id. at 530.  The Court observed that:

> A right of privacy in traditional Fourth Amendment terms is
> fundamentally incompatible with the close and continual
> surveillance of inmates and their cells required to ensure
> institutional security and internal order.... [S]ociety
> would insist that the prisoner's expectation of privacy

always yield to what must be considered the paramount interest in institutional security.... [I]t is accepted by our society that loss of freedom of choice and privacy are inherent incidents of confinement.

Id. at 527-28 (footnotes, citations and internal quotation marks omitted). The same conclusion was reached with respect to pretrial detainees other than convicted prisoners. See Bell v. Wolfish, 441 U.S. 520, 558-560 (1979)(finding that a body cavity searches of pretrial detainees do not violate the Fourth Amendment).[9]

Consequently, involuntarily committed patients and SVPs, like pretrial detainees, are entitled to some protection under the Fourth Amendment, but they do not have an expectation of privacy equal to an individual in society generally. See Serna v. Goodno, 567 F.3d 944, 948 (8th Cir. 2009)(noting that pretrial detainees are kept in custody because there is cause to believe they are dangerous; similarly, commitment under Minnesota law as a sexually dangerous person requires a finding of dangerousness), cert. denied, 130 S.Ct. 465 (2009); Allison v. Snyder, 332 F.3d

_____

[9]   In Bell v. Wolfish, the United States Supreme Court, in determining the constitutionality of post-visitation body cavity searches, held that a reasonableness test should be employed when examining the constitutionality of a search that encroaches upon the personal privacy of an inmate and the integrity of the inmate's body. In other words, courts must balance the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted. 441 U.S. 520, 559 (1979); see also Turner v. Safley, 482 U.S. 78 (1987) (a prison regulation which infringes upon an inmate's constitutionally recognized right is valid only if it is reasonably related to a legitimate penological interest).

1076-79 (7th Cir. 2003)(SVPs may be subjected to conditions that advance goals such as preventing escape and assuring the safety of others, even though they may not technically be "punished"), cert. denied, 540 U.S. 985 (2003); Aiken v. Nixon, 236 F. Supp.2d 211, 233 (N.D.N.Y. 2002), aff'd 80 Fed. Appx. 146 (2d Cir. 2003); see also, Jennings v. New York State Office of Mental Health, 786 F. Supp. 376, 382, 384 (S.D.N.Y. 1992), aff'd, 977 F.2d 731 (2d Cir. 1992).

Similarly, the United States Court of Appeals for the Ninth Circuit has held that, because SVPs have been civilly committed subsequent to criminal convictions and have been adjudged to pose a danger to the health and safety of others, they are subject to "[l]egitimate, non-punitive government interests" such as "maintaining jail security, and effective management of [the] detention facility." Jones v. Blanas, 393 F.3d 918, 932 (9th Cir. 2004). Thus, the reasonableness of a particular search or seizure is determined by reference to the detention context and is a fact-intensive inquiry. Id.

Here, with respect to his Fourth Amendment claim, Graham's primary argument appears to be that any prison actions that did not specifically take into account his classification as a SVP is per se a constitutional violation. Applying the balancing test employed by Wolfish, this Court finds that the manner and place in which Graham was pat-searched was plainly reasonable and did not violate his Fourth Amendment rights. Pat searches are

conducted when Graham enters the yard or returns to his unit from yard time.  See Semler v. Ludeman, 2010 WL 145275, *19, D. Minn. Jan. 8, 2010)(finding no Fourth Amendment violation where plaintiffs were required to submit to pat searches following gym use and kitchen work assignments that included removal of socks and shoes, opening their mouths, showing their zippers, showing behind their ears and running their fingers through their hair; search was "not highly intrusive" and was "not unlike the scope of searches of the general public at airport security checkpoints).  See also Serna v. Goodno, 567 F.3d 944, 955-56 (upholding reasonableness of a facility-wide visual body cavity search after a cell phone case (cell phones considered contraband) was found, because, while invasive, the searches were conducted privately, safely, and professionally, and the facility was reacting to a recurring problem involving contraband cell phones0, cert. denied, 130 S. Ct. 465 (Oct. 20, 2009).

Moreover, there are no allegations that the guards conducted the pat search and the cell search for electronic equipment in a menacing or degrading manner.  Graham does not allege that there was physical force used or that the search was done in a menacing manner.  See Kitchens v. Mims, 2010 WL 1240980 (E.D.Cal. March 25, 2010).

Likewise, the single strip search incident fails to state a claim of constitutional magnitude.  The strip search was done after Graham had been to the yard.  While Graham alleges that the

strip search was not performed in a private area and that the officers were verbally degrading him, Graham does not allege any physical force was used, or that it was conducted solely for the purpose of punishment.

Therefore, based on all of these factors, this Court will dismiss with prejudice Graham's Fourth Amendment unlawful search claim, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii), for failure to state a cognizable claim under § 1983.

2. *Interference With Mail*

Next, Graham seems to complain that his mail must be sent to Avenel rather than directly to the EJSP unit where he is confined.  The Court perceives this claim as asserting a violation of plaintiff's First Amendment rights.  However, Graham does not indicate that he has not received mail or packages, or that his mail has been opened outside his presence.  Rather, he merely alleges that he believes his mail is being monitored without any factual support for the bald claim.

As a general rule, inmates have a limited liberty interest in their mail under the First and Fourteenth Amendments.  <u>Jones v. Brown</u>, 461 F.3d 353, 358 (3d Cir. 2006), <u>cert. denied</u>, 549 U.S. 1286 (2007).[10]  However, an inmate's constitutional right to

_____

[10]   In <u>Jones v. Brown</u>, the United States Court of Appeals for the Third Circuit held that the legal mail policy of state prison in opening legal mail outside the presence of the inmate violated the inmate's First Amendment right to freedom of speech, and was not reasonably related to prison's legitimate penological interest in protecting health and safety of prisoners and staff. 461 F.3d at 358.  The Third Circuit also has held that "a pattern

send and receive mail may be restricted for legitimate
penological interests.  See Thornburgh v. Abbott, 490 U.S. 401,
407 (1989); Turner v. Safley, 482 U.S. 78, 89 (1987).  In Turner,
the Supreme Court of the United States found that a prison
regulation infringing on an inmate's constitutional rights is
valid so long as it is reasonably related to a legitimate
penological interest.  Id. at 89.  The Court established a
balancing test pursuant to which courts analyze prohibitions on
prisoners' exercise of their constitutional rights by considering
the following four factors: (1) whether prohibiting an inmate
from exercising a constitutional right is rationally related to a
legitimate governmental interest; (2) whether there are
alternative means of exercising that right; (3) what effect
accommodation of the interest would have on guards, other
inmates, and the allocation of prison resources; and (4) whether
there are ready alternatives available that continue to serve the
prison's interest without impinging constitutional rights.
Turner, 482 U.S. at 89-91.  The Court also recognized that

---

and practice of opening properly marked incoming court mail
outside an inmate's presence infringes communication protected by
the right to free speech.  Such a practice chills protected
expression and may inhibit the inmate's ability to speak,
protest, and complain openly, directly, and without reservation
with the court." Bierequ v. Reno, 59 F.3d 1445, 1452 (3d Cir.
1995) (applying the Turner analysis), implied overruling on other
grounds recognized in Oliver v. Fauver, 118 F.3d 175, 177-78 (3d
Cir. 1997). Thus, the assertion that legal mail is intentionally
opened and read, delayed for an inordinate period of time, or
stolen may state a First Amendment claim.  See, e.g., Antonelli
v. Sheahan, 81 F.3d 1422, 1431-32 (7th Cir. 1996); Castillo v.
Cook County Mail Room Dep't, 990 F.2d 304 (7th Cir. 1993).

deference should be given to the decisions of prison
administrators, especially when those decisions deal with issues
of prison safety and security.  Id.

The United States Court of Appeals for the Third Circuit has
applied Turner in analyzing constitutional claims by civilly
committed SVPs.  See Rivera v. Rogers, 224 Fed. Appx. 148, 2007
WL 934413 (3d Cir. March 29, 2007)(applying Turner in analyzing
claims of SVPs that opening of their packages violated their
First Amendment rights).  Other courts likewise have applied
Turner when analyzing claims brought by civilly committed SVPs
alleging First Amendment violations.[11]  See Willis v. Smith, 2005
WL 550528 (N.D. Iowa Feb. 28, 2005)(noting that status of SVPs
was substantially similar to that of prisoners and applying
Turner to SVP claims concerning mail handling procedures); Ivey
v. Mooney, 2008 WL 4527792, at *4 n. 7 (D. Minn. Sept. 30,
2008)(applying Turner, but noting that a civil confinement is
significantly different from a criminal confinement); Francis v.
Watson, 2006 WL 2716452, at *3 (D.S.C. Sept. 22, 2006)(citing
cases that have applied Turner in cases involving civilly
confined persons); Marsh v. Liberty Behavioral Health Care, Inc.,

_____

[11]  Essentially, the First Amendment analysis under Turner
mirrors the due process analysis under Youngberg; in both
instances, courts must balance the constitutional interests of
confined persons against the legitimate interests of the state-
run institution in which they reside.  See Beaulieu v. Ludeman,
2008 WL 2498241, at *20 n. 15 (finding Turner to be consistent
with Youngberg because "it will not allow a Program detainee's
right to be restricted unless there is a valid institutional
reason for doing so").

2008 WL 821623, at *5 (M.D. Fla. Mar. 27, 2008), aff'd 330 Fed.
Appx. 179 (11th Cir. 2009); Beaulieu v. Ludeman, 2008 WL 2498241,
at *20 (D. Minn. June 18, 2008).

In Rivera, the Third Circuit affirmed the district court's
ruling that a facility housing civilly committed SVPs has a
legitimate interest in both the safety of its facility and the
rehabilitation of its patients.  Rivera, 224 Fed. Appx. at 151
(citing Waterman v. Farmer, 183 F.3d 208, 215 (3d Cir.
1999)("[I]t is beyond dispute that New Jersey has a legitimate
penological interest in rehabilitating its most dangerous and
compulsive sex offenders.")).  Specifically, the court upheld as
constitutional the STU's policy that allows staff to open
packages not marked as "legal mail" to assure that the packages
do not contain contraband (i.e., items either harmful to staff
and residents, or detrimental to rehabilitation).  The court
found that plaintiff was free to send and receive mail so long as
the content of his mail was not sexually explicit.  Moreover, the
Third Circuit found no error in the district court's conclusion
that there were no ready alternatives to mail security and that
the STU's policy appeared to be the only viable alternative, thus
supporting the reasonableness of the mail policy.  Rivera, 224
Fed. Appx. at 151.

Here, this Court likewise finds that it is beyond dispute
that the staff at EJSP, where plaintiff and other SVP residents
are newly housed, has a legitimate interest in both the safety of

its facility and rehabilitating its patients.  As noted above, these civilly committed persons are convicted sexual predators, which makes safety at EJSP a very important concern.  The staff clearly must determine if any items coming through the mail pose a threat to the safety of the staff or the other residents.  They also must decide if any of the materials passing through the mail could be detrimental to a resident's therapy.  Consequently, as set forth by the Supreme Court and the Third Circuit, the Court must defer to the prison officials when it comes to issues of managing a safe and operational prison facility.  In this case, delivery of letters and packages at the Avenel facility located close by, where the staff is trained with respect to SVP issues unlike the general NJDOC staff at EJSP, assures that harmful materials are not being passed through the mail, but also allows for specialized treatment regarding SVP residents.  This new policy, which appears to be preliminarily instituted because of the recent transfer of the SVP residents to EJSP, clearly bears a rational relationship to both interests discussed above.

Moreover, in his interference with the mail claim, Graham fails to allege even a single incident of interference with his mail.  A single interference with the delivery of an inmate's personal mail, without more, does not rise to the level of a constitutional deprivation.  Morgan v. Montayne, 516 F.2d 1367 (2d Cir. 1975), cert. denied, 424 U.S. 973 (1976).  Thus, the only continuing complaint seems to be that his mail is sent to

another facility instead of EJSP where he now resides.  Graham
does not articulate a claim that prison officials are
intentionally delaying or opening his mail.  Therefore, the Court
will dismiss this claim with prejudice.

    3.  *Confiscation of Electronic Devices*

    Graham also complains about a new policy memo issued on
November 1, 2010 that restricts certain electronic equipment
(memory sticks; flash drives; thumb drives; detachable or
external drives; data storage devices; X-box Elite, Play Station
3 and Wii game systems; and remote controls with digital read out
or viewing screens) for SVP residents in the EJSP STU.  He
complains that anyone in possession of such electronic devices
will have such equipment confiscated in violation of his
constitutional rights.  It would appear that plaintiff is
asserting a deprivation of property claim and/or a First
Amendment violation.

    This Court finds that a First Amendment claim, if asserted,
is governed by the standard in <u>Turner v. Safely</u>, <u>supra</u>, which
sets out the standard for challenges to regulations that restrict
a prisoner's fundamental constitutional rights.  Although the
courts have not defined the contours of a civilly detained
person's right to free speech, Graham's rights are at least co-
extensive with the rights of prisoners with respect to
institutional regulations that curtail First Amendment rights.
<u>E.g.</u>, <u>City of Revere v. Massachusetts Gen. Hosp.</u>, 463 U.S. 239,

244 (1983)("[T]he due process rights of a [pretrial detainee or
other persons in state custody] are at least as great as the
Eighth Amendment protections available to a convicted prisoner").
Thus, a Turner analysis is applicable here despite the fact that
plaintiff is not a prisoner.  See e.g., Bell v. Wolfish, 441 U.S.
at 545-46 ("A detainee simply does not possess the full range of
freedoms of an unincarcerated individual" because "[t]he fact of
confinement as well as the legitimate goals and policies" of the
institution limit constitutional rights.); Allison v. Snyder, 332
F.3d 1076, 1079 (7th Cir. 2002)(persons confined as sexually
violent "may be subjected to the ordinary conditions of
confinement").

        In the prison setting, regulations that restrict a
prisoner's access to use and own electronic equipment are "valid
[if they] are reasonably related to legitimate penological
interests."  Thornburgh v. Abbott, 490 U.S. 401, 413 (1989)
(citing Turner, 482 U.S. at 89).  Applying the Turner rule to an
institutional setting such as EJSP, institution regulations that
restrict a patient's First Amendment rights are valid if they are
reasonably related to a legitimate institutional interests, such
as maintaining security, preserving internal order and
rehabilitation.  McKune v. Lile, 536 U.S. 24, 36 (2002)
("[R]ehabilitation is a legitimate penological interest that must
be weighed against the exercise of an inmate's liberty.");
Turner, 482 U.S. at 91 (rehabilitation and maintaining security
are legitimate penological interests); Allison, 332 F.3d at 1079

(preventing escape and assuring safety of others are legitimate institutional interests).

Here, this Court finds that the first <u>Turner</u> factor is satisfied because the EJSP STU new rule prohibiting these delineated electronic devices are reasonably related to the legitimate institutional interests of security and the orderly running of the EJSP.  The November 1, 2010 memo regarding the new rule, which was attached by plaintiff to his Complaint, expressly states that security and orderly operation of the facility is the purpose of the rule change.  Indeed, this Court finds that EJSP STU has a legitimate interest in maintaining security of its facility by preventing residents from improperly using computers to engage in fraud, extortion and other criminal activity and preventing discord that could occur between residents owning the electronic equipment targeted with those who do not.  <u>See</u> <u>Semler</u> <u>v. Ludeman</u>, 2010 WL 145275, *9-16 (D. Minn. Jan. 8, 2010) (institution rules governing media, mail, personal property, telephone access and association between patients confined as sexually violent persons are valid under <u>Turner</u> because they are reasonably related to legitimate security and rehabilitative interests); <u>Spicer v. Richards</u>, 2008 WL 3540182, *7-8 (W.D. Wash. Aug. 11, 2008)(state facility for civil detainee's "ban on the possession of electronic devices is reasonably related to the security and safety risks posed to [its] residents, staff, visitors, and the public," and therefore not violative of civil detainee's constitutional rights).  In addition, the EJSP STU has

an interest in promoting rehabilitation and a therapeutic environment by preventing patients from accessing pornography, contacting their victims, viewing movies that may reinforce cognitive distortions or sexual deviance and playing video games that may encourage anti-social or obsessive behavior.  See Hedgespeth v. Bartow, 2010 WL 2990897 at *6-7 (W.D. Wisc. July 27, 2010).

Moreover, defendants have a legitimate security interest in making uniform rules regarding property ownership and media restrictions to prevent discord, extortion and unauthorized property exchanges among patients, as well as legitimate security and rehabilitative interests in keeping potential damaging materials out of the institution altogether.  See Allison, 332 F.3d at 1079 (security is legitimate institutional interest); Hedgespeth, 2010 WL 2990897 at *8.

The third Turner factor also weighs heavily in favor of the defendants' new electronic restrictions.  Allowing residents to own digital storage devices, video game systems and the other listed electronic devices would be a security, treatment and administrative nightmare.  Security staff would need to screen each resident's electronic equipment for unauthorized content regularly and frequently.  Additionally, because it is relatively easy to hide and transfer digital files by these restricted devices, some residents likely would succeed in caching and accessing unlawful or counter-therapeutic data.  Thus, unrestricted access to the internet and video games at EJSP STU

likely would interfere with the efforts to treat the patients and operate the facility in a secure and orderly manner.  Hedgespeth, supra.

Finally, this Court notes that Graham has failed to articulate any reason or alternative that would refute the clearly expressed security need for the new restriction on electronic devices.  He simply states a legal claim that his constitutional rights will be violated without any factual support.  Such claim does not pass muster for statement of a claim under the Iqbal standard.

Facilities that house and deal with residents who have been involuntarily committed for sexual disorders are "'volatile' environments whose day-to-day operations cannot be managed from on high." Thielman v. Leean, 282 F.3d 478, 483 (7th Cir. 2002). Courts must presume that the judgment exercised by the appropriate professionals in these facilities is reasonable.  Id. (citing Youngberg v. Romeo, 457 U.S. 307, 312-24 (1982) (extending "professional judgment" standard to substantive due process claim brought by involuntarily committed mental patient and noting that such a presumption was "necessary to enable institutions of this type-often, unfortunately, overcrowded and understaffed-to continue to function"); see also Hedgespeth, 2010 WL 2990897 at *9.  Accordingly, this Court finds that Graham has completely failed to state a claim of constitutional magnitude in this regard, and his claim must be dismissed with prejudice accordingly.

Finally, to the extent that plaintiff is raising a deprivation of property claim, his claim must be dismissed for failure to state a claim.  The Fourteenth Amendment provides, in pertinent part here, that the State may not "deprive any person of life, liberty, or property, without due process of law[.]"  The "due process of law" essentially requires that the government provide a person notice and opportunity to be heard in connection with the deprivation of life, liberty or property.  <u>Zappan v. Pennsylvania Board of Probation and Parole</u>, 152 Fed. Appx. 211, 220 (3d Cir. 2005)("The essential requirements of any procedural due process claim are notice and the opportunity to be heard.").  Hence, to establish a prima facie case of a procedural due process violation, a plaintiff must establish: (1) a deprivation of a constitutionally protected liberty or property interest, (2) state action, and (3) constitutionally inadequate process.  <u>See</u> <u>Rusnak v. Williams</u>, 44 Fed. Appx. 555, 558 (3d Cir. 2002) ("Procedural due process claims, to be valid, must allege state sponsored-deprivation of a protected interest in life, liberty or property.  If such an interest has been or will be deprived, procedural due process requires that the governmental unit provide the individual with notice and a reasonable opportunity to be heard.")(citation omitted).

To have a property interest, Graham must demonstrate "more than an abstract need or desire for it. ... He must, instead, have a legitimate claim of entitlement to it" under state or federal law.  <u>Board of Regents v. Roth</u>, 408 U.S. 564, 577 (1972).

For present purposes, a procedural due process analysis involves a two step inquiry: the first question to be asked is whether the complaining party has a protected liberty or property interest within the contemplation of the Due Process clause of which he has been deprived and, if so, the second question is whether the process afforded the complaining party to deprive him of that interest comported with constitutional requirements.  Shoats v. Horn, 213 F.3d 140, 143 (3d Cir. 2000).

Here, as demonstrated above, the restrictions on electronic devices are neither arbitrary or capricious, but plainly were implemented in order to address the security and operational concerns of a prison facility, which also houses civilly committed sex offenders.  Graham has not demonstrated a constitutionally-recognized property interest in the continued possession of unrestricted electronic devices necessary to satisfy the threshold requirement of a deprivation of property interest.  See Semler v. Ludeman, 2010 WL 145275, *25 (D. Minn. Jan. 8, 2010).

Furthermore, to the extent that Graham may have had electronic equipment confiscated, as alleged, he has a post-deprivation remedy.  Property loss caused by the intentional acts of government officials does not give rise to a procedural due process claim under § 1983 where a post-deprivation remedy satisfying minimum procedural due process requirements is available under state law.  See Parratt v. Taylor, 451 U.S. 527 (1981) (overruled in part on other grounds by Daniels v.

40

_Williams_, 474 U.S. 327 (1986)); _see also_ _Zinermon v. Burch_, 494
U.S. 113, 115 (1990); _Hudson v. Palmer_, 468 U.S. 517 (1984);
_Holman_, 712 F.2d at 856.[12]  The New Jersey Tort Claims Act
("NJTCA"), N.J. STAT. ANN. § 59:1-1 _et seq._, provides a post-
deprivation judicial remedy to persons who believe they were
deprived of property at the hands of the State or local
government.  _See_  _Holman_, 712 F.2d at 857; _Asquith v. Volunteers
of America_, 1 F. Supp.2d 405, 419 (D.N.J. 1998), _aff'd_ 186 F.3d
407 (3d Cir. 1999).

Therefore, any deprivation of property claim asserted by
Graham here will be dismissed with prejudice for failure to state
a claim, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).

4.  _Unsanitary Conditions_

Finally, Graham alleges that his unit has leaking ceilings
when it rains.  He also complains about a bed bug infestation,
but admits that extermination services have been contracted on a
weekly basis to address and remedy the problem.  He does not
contend that these conditions are intended as punishment, or that
he has suffered adversely from these alleged conditions.  Based

---

[12]  In _Logan v. Zimmerman Brush Co._, 455 U.S. 422 (1982),
the Supreme Court explained, however, that post-deprivation
remedies do not satisfy the Due Process Clause if the deprivation
of property is accomplished pursuant to established state
procedure rather than through random, unauthorized action.  455
U.S. at 435-36.  _But see_ _Tillman v. Lebanon Co. Correctional
Facility_, 221 F.3d 410, 421 n.12 (3d. Cir. 2000)(citing _United
States v. James Daneil Good Real Property_, 510 U.S. 43, 53
(1993))(in "extraordinary situations" such as routine deduction
of fees from a prisoner's account even without authorization,
post-deprivation remedies may be adequate).

on these general allegations, even if true, the Court finds no atypical or significant deprivation that would rise to the level of a constitutional violation at this time.

Therefore, with respect to his conditions claims as alleged, this Court finds that Graham has failed to state a cognizable claim.  Given that this is plaintiff's second attempt at raising this claim, and he has failed to allege new or additional facts to sustain a conditions claim, and indeed, has relied on the same factual allegations as asserted previously, which were dismissed without prejudice in Civil No. 10-2010 (KSH), in this matter.

C.  Access to Law Library Claim

This Court next considers plaintiff's allegations that he has been denied access to the courts (via denial of access to the law library) in violation of his First and Fourteenth Amendment rights.  Courts have recognized different constitutional sources for the right of access to the courts.  Principally, the right of access derives from the First Amendment's right to petition and the due process clauses of the Fifth and Fourteenth Amendments.[13]

---

[13]  The right of access to the courts is an aspect of the First Amendment right to petition.  McDonald v. Smith, 472 U.S. 479, 482 (1985); Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 741 (1983); Milhouse v. Carlson, 652 F.2d 371, 373 (3d Cir. 1981).  The Supreme Court also found that "[t]he constitutional guarantee of due process of law has as a corollary the requirement that prisoners be afforded access to the courts in order to challenge unlawful convictions and to seek redress for violations of their constitutional rights."  Procunier v. Martinez, 416 U.S. 396, 419 (1974), overruled on other grounds, Thornburgh v. Abbott, 490 U.S. 401, 413-14 (1989).  See also, Hudson v. Palmer, 468 U.S. 517, 523 (1984) ("prisoners have the constitutional right to petition the Government for redress of their grievances, which includes a reasonable right of access to

The right of access to the courts requires that "adequate, effective, and meaningful" access must be provided inmates who wish to challenge their criminal charge, conviction, or conditions of confinement.  <u>Bounds v. Smith</u>, 430 U.S. 817, 822 (1977).  In other words, prison officials must "give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the Courts."  <u>Id</u>. at 825. "'[T]he touchstone ... is meaningful access to the courts.'" <u>Peterkin v. Jeffes</u>, 855 F.2d 1021, 1037 (3d Cir. 1988)(*quoting* <u>Bounds</u>, 430 U.S. at 823)(internal quotation omitted).

     In <u>Bounds</u>, the Supreme Court held that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law."  The right of access to the courts is not, however, unlimited.  "The tools [that Bounds] requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement.  Impairment of any <u>other</u> litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and

---

the courts"); <u>Bounds v. Smith</u>, 430 U.S. 817 (1977); <u>Wolff v. McDonnell</u>, 418 U.S. 539, 576 (1974).  The right of access to the courts might also arise under the Sixth Amendment's right to counsel; however, under the circumstances of the present case, the Sixth Amendment clearly is not implicated.

incarceration." Lewis v. Casey, 518 U.S. 343, 355 (1996) (emphasis in original). Similarly, a pretrial detainee has a right of access to the courts with respect to legal assistance and participation in one's own defense against pending criminal charges. See, e.g., May v. Sheahan, 226 F.3d 876, 883-84 (7th Cir. 2000); Caldwell v. Hall, 2000 WL 343229 (E.D. Pa. March 31, 2000). But see United States v. Byrd, 208 F.3d 592, 593 (7th Cir. 2000) (pretrial detainee who rejects an offer of court-appointed counsel in satisfaction of the Sixth Amendment right to counsel has no alternative right to access to a law library); Wilson v. Blankenship, 163 F.3d 1284, 1290-91 (11th Cir. 1998) (same); United States v. Walker, 129 F.3d 1266, 1997 WL 720385, **4 (6th Cir. 1997) (same).

Moreover, a prisoner alleging a violation of his right of access must show that prison officials caused him past or imminent "actual injury" by hindering his efforts to pursue such a claim or defense. See Lewis, 518 U.S. at 348-51, 354-55 (1996); Oliver v. Fauver, 118 F.3d 175, 177-78 (3d Cir. 1997). "He might show, for example, that a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known. Or that he had suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of the law library that he was unable to file even a complaint." Lewis, 518 U.S. at 351.

Here, Graham fails to allege any actual injury as a result of the alleged denial of access to the law library.  He does not allege that he was unable to file this or any other complaint in the courts, and in fact, he has not been limited in filing the instant action, or his several other recent Complaints in this federal court.  Consequently, the allegations in the Complaint are too conclusory to show a denial of court access sufficient to rise to the level of a constitutional deprivation under the Iqbal pleading standard.  "[T]he pleading standard Rule 8 announces does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation .... Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."  Iqbal, 129 S.Ct. at 1949 (citations and internal quotation marks omitted).

Furthermore, Graham does not articulate how the alleged denial of access to the law library has hindered his efforts to either pursue this claim or defend himself in any pending state proceedings.  Indeed, he has filed three civil complaints in this District since he was transferred to the EJSP-STU, and moreover, he admits that he has assigned counsel to help him with respect to his yearly civil commitment reviews.  Consequently, Graham has not and cannot demonstrate any actual injury, which is a necessary prerequisite to establishing a denial of access tot courts claim.  Therefore, Graham's claim alleging denial of access to the courts based on an alleged failure to provide

access to the law library will be dismissed with prejudice for failure to state a claim.

D.  Denial of Treatment Claim

Graham also continues to assert that therapy/treatment sessions have been disrupted or denied because of the prison setting and control by NJDOC officials over movements and conduct of the residents in the EJSP-STU.  In particular, Graham alleges that he has been restricted from participating in therapy and treatment sessions with his "mental support" group, who are housed elsewhere at the EJSP-STU.  Thus, Graham appears to argue that he is denied the right to adequate treatment and reasonable care applicable to civilly committed SVPs, in violation of the Fourteenth Amendment.

The Fourteenth Amendment to the United States Constitution, § 1, guarantees that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law."  This due process guarantee has been interpreted to have both procedural and substantive components, the latter which protects fundamental rights that are so "implicit in the concept of ordered liberty" that "neither liberty nor justice would exist if they were sacrificed."  Palko v. Conn., 302 U.S. 319, 325 (1937). These fundamental rights include those guaranteed by the Bill of Rights, as well as certain liberty and privacy interests implicitly protected by the Due Process Clause, such as the right to marry.  Washington v. Glucksberg, 521 U.S. 702, 720 (1997). Substantive due process also protects against government conduct

46

that is so egregious that it "shocks the conscience," even where
the conduct does not implicate any specific fundamental right.
See United States v. Salerno, 481 U.S. 739, 746 (1987).

Laws disturbing fundamental rights receive strict scrutiny
and will be upheld if they are "narrowly tailored to serve a
compelling state interest." Reno v. Flores, 507 U.S. 292, 302
(1993). However, regulations not implicating fundamental rights
(in other words, those claims attacking particularly egregious or
arbitrary governmental actions) are analyzed under the
deferential standard referred to as the rational basis review,
and will generally succeed only if the government action shocks
the conscience. See Glucksberg, 521 U.S. at 728.

With respect to Graham's claim, it appears that he is
asserting that he has a fundamental right to adequate treatment
as a civilly committed sex offender, and that as a result of the
prison setting he is not being afforded adequate treatment. The
Supreme Court established that there exists a constitutionally
protected right of mentally retarded persons confined at a state
institution to minimally adequate treatment. Specifically, the
Supreme Court held that there is a constitutional right of
mentally disabled persons confined at a state institution to
"minimally adequate habilitation", self-care treatment or
training to the extent necessary to protect their recognized
fundamental rights to safety and freedom from physical
restraints. Youngberg, 457 U.S. at 316, 319 and 322.

The Supreme Court further held that, where a fundamental right is at issue, a district court must balance "the liberty of the individual and the demands of an organized society" to determine whether such right has been violated.  Youngberg, 457 U.S. at 320.  Although restrictions burdening a fundamental right generally receive strict scrutiny, in Youngberg, the Supreme Court found that this sort of rigorous analysis would unduly burden the ability of states, specifically their professional employees, to administer mental health institutions.  Id. at 322. Consequently, the Court concluded that "the Constitution only requires that the courts make certain that professional judgment was in fact exercised," because "[i]t is not appropriate for the courts to specify which of several professionally acceptable choices should have been made."  Id. at 321 (internal quotation and citation omitted).  Thus, a decision, "if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such judgment."  Id. at 323.

In Leamer v. Fauver, 288 F.3d 532 (3d Cir. 2002), the United States Court of Appeals for the Third Circuit held that New Jersey's unique former statutory scheme for sex offenders that predicated the term of sentence on a prisoner's response to treatment and created a right to treatment created a fundamental and cognizable liberty interest in treatment, for purposes of

48

both procedural and substantive due process analyses.   288 F.3d
at 545.   Leamer was not a civilly committed sex offender like
plaintiff here.   Rather, Leamer was a convicted sex offender
whose confinement and treatment were inextricably linked pursuant
to statute.   The sentencing court had classified Leamer as having
a "mental aberration" and in need of "specialized treatment,"
which automatically subjected Leamer to the maximum incarceration
permitted by law unless he is cured prior to that point.   Leamer
could not reduce his sentence through good behavior credits,
parole policies or other credits.   Instead, he could only shorten
his incarceration through successful therapy, which was an
"inherent and integral element" of the statutory scheme.
Consequently, the Third Circuit found that deprivation of
treatment would be a grievous loss not emanating from the
sentence.   Leamer, 288 F.3d at 544.

        Apart from that recognized in Youngberg to prevent the
violation of recognized fundamental rights to safety and freedom
from physical restraints, this Court finds the Third Circuit's
holding in Leamer to clearly extend to an involuntarily committed
sex offender under New Jersey's SVPA.   Like Leamer, the length of
Graham's confinement under the SVPA is predicated on his response
to treatment.   Indeed, the provisions of the SVPA explicitly
recognize New Jersey's obligation to provide treatment to SVPs
for their eventual release based on successful therapy.   See
N.J.S.A. 30:4-27.32(a)("If the court finds by clear and
convincing evidence that the person needs continued involuntary

49

commitment as a sexually violent predator, it shall issue an
order authorizing the involuntary commitment of the person to a
facility designated for the custody, care and **treatment** of
sexually violent predators")(emphasis added); N.J.S.A. 30:4-
34(b)("The Division of Mental Health Services in the Department
of Human Services shall provide or arrange for treatment for a
person committed pursuant to this act.  Such treatment shall be
appropriately tailored to address the specific needs of sexually
violent predators."); N.J.S.A. 30:4-27.36(a)(At any time during
the involuntary commitment of a person under this act, if the
person's treatment team determines that the person's mental
condition has so changed that the person is not likely to engage
in acts of sexual violence if released, the treatment team shall
recommend that the Department of Human Services authorize the
person to petition the court for discharge from involuntary
commitment status"); see also Kansas v. Hendricks, 521 U.S. 346,
367 (1997)(concluding from similarly-worded provisions of Kansas
SVP Act that "the State has a statutory obligation to provide
'care and treatment for [persons adjudged sexually dangerous]
designed to effect recovery ....")(alterations in
original)(internal citations omitted).

     Therefore, based on Youngberg and Leamer, this Court
concludes that Graham may have a fundamental liberty interest in
treatment, but has not stated a cognizable claim at this time for
purposes of both procedural and substantive due process analyses.
See Bailey v. Gardebring, 940 F.2d 1150, 1154 (8th Cir. 1991),

cert. denied, 503 U.S. 952 (1992)(where the Eighth Circuit noted
that Youngberg did not establish a right for the civilly
committed to treatment per se; the Supreme Court only "held that
the Constitution required only such 'minimally adequate training
... as may be reasonable in light of [the] liberty interest[ ] in
safety and freedom from unreasonable restraints.'")(quoting
Youngberg, 457 U.S. at 322).  In Bailey, the Eighth Circuit
concluded that plaintiff had no right to "psychiatric treatment
to overcome a 'sexual offender condition'"  because he "was
neither in danger during his civil commitment nor was he subject
to any restraints beyond the ordinary incidents of any
involuntary confinement."  Id. at 1153, 1154.  Citing Bailey,
district courts in the Eighth Circuit have since concluded that
civilly committed sexual predators have no substantive due
process right to mental health treatment, adequate or otherwise.
See Semler v. Ludeman, 2010 WL 145275, at *26 (D. Minn. Jan. 8,
2010)("Because this Court has not recognized a constitutional
right to effective 'treatment' in the context of civilly
committed sex offenders, Plaintiffs [alleging substantive due
process violations through ineffective treatment] have failed to
allege a due process claim ....")(citing Nicolaison v. Ludeman,
2008 WL 508549, at *8 (D. Minn. Feb. 11, 2008)(finding, in
ultimately concluding that involuntarily committed sex offender's
right to treatment is not "clearly established" for purposes of
28 U.S.C. § 2254(d)(1), that Youngberg "only recognized a right
to 'minimally adequate' treatment that reduces the need for

restraints," and not a "comparable right to treatment that
facilitates release")).

Indeed, based on the allegations and admissions by plaintiff
in his Complaint, Graham again has failed to show any procedural
or substantive due process violations.  He does not demonstrate a
categorical denial of therapy and treatment sessions due to the
prison setting in which he receives his treatment.  Rather, he is
dissatisfied with his therapist's determination or treatment plan
that has plaintiff separated from his "mental support" group.
Moreover, Graham admits that the restrictions have been based on
his own treatment refusal, although Graham does not fully concede
that he himself has been uncooperative.  The allegations show
that his treatment phase dropped due to his missing sessions, for
refusing to follow treatment plan recommendations, and not
because of his filing grievances.  In fact, the treatment refusal
status memo confirms that the status restriction was imposed due
to plaintiff's continued failure to participate meaningfully or
attend his scheduled process group on a regular basis.  There are
simply no factual assertions other than Graham's bald conclusory
claim that his treatment is curtailed as punishment for filing
grievances or complaining.

In Leamer, the Third Circuit, relying on Sandin, found that
Leamer would face "significant obstacles" in establishing a
procedural due process claim based on his placement on RAP
(restricted activities program) status because the mere fact of
placement in administrative segregation is not in and of itself

enough to implicate a liberty interest.  <u>Leamer</u>, 288 F.3d at 546.
Similarly, in the instant case, although Graham and other
disruptive and agitative residents may be placed in MAP status in
response to their behavior or uncooperation, there is no
indication from the allegations here that these residents have
been or will be denied treatment.

Indeed, there are no factual allegations of an absolute
denial of treatment.  Rather, Graham merely alleges that prison
staff regulate movement and conduct searches and other policy
measures for the orderly running and security of the EJSP
facility as a whole, which Graham feels affects his access to the
treatment sessions of his choice.  He does not allege that he has
been denied treatment altogether.  Further, Graham merely recites
legal conclusions in his complaint about being made to feel like
a "prisoner" rather than a civilly committed person rather than
allege any facts to support a claim that he has been denied
treatment.  Indeed, he seems mostly fixated on the idea of being
in a "prison setting" and does not allege any real disruption or
interference with his treatment, except through his own
contumacious conduct in being in a "prison setting."

This Court likewise finds no substantive due process
violation at this time.  Substantive due process prevents the
government from engaging in conduct that "shocks the conscience,"
or interferes with rights "implicit in the concept of ordered
liberty."  <u>Glucksberg</u>, 521 U.S. at 721.  Under this standard,
Defendants' actions in denying Graham his statutory right to

treatment will be found unconstitutional under the Fourteenth Amendment if they were so arbitrary or egregious as to shock the conscience. See Leamer, 288 F.3d at 546-47 (substantive due process claim alleging inadequate treatment for committed sex offender "must focus on the challenged abuse of power by officials in denying [the plaintiff] the treatment regimen that was statutorily mandated and was necessary in order for his condition to improve, and thus for him to advance toward release").

Here, as demonstrated above, defendants have not categorically declined to provide any mental health treatment to Graham.  Thus, this Court cannot readily conclude that Defendants' actions were conscience-shocking and in violation of Graham's substantive due process rights.  Indeed, plaintiff's allegations, as set forth above, are merely conclusory and factually unsubstantiated.  Graham has not shown any disruption of treatment.  Instead, he simply objects to the manner and place in which treatment and sessions are provided.

Thus, the Court concludes that treatment has not been denied to Graham, as alleged because there is no demonstrated interruption of adequate treatment that would rise to the level of a constitutional due process deprivation as alleged.  Further, this Court concludes that the allegations asserted in Graham's Complaints do not show such egregious conduct or disruption as to render mental treatment at EJSP conscience-shockingly deficient.

Accordingly, Graham's claim alleging inadequate treatment will be dismissed with prejudice for failure to state a cognizable claim of a deprivation of a constitutional right. The Court reiterates the observation that this is Graham's second attempt to state a claim, and he has failed to muster allegations that would support a denial of or inadequate treatment claim. Indeed, his claim is merely repetitive and the Court finds no reason or argument by plaintiff that would permit plaintiff yet another bite at the apple. Accordingly, the Court is constrained to dismiss this claim with prejudice for failure to state a cognizable claim under § 1983.

E.  Harassment Claim

Graham further complains that he is being harassed by the correctional officers. Namely, on several occasions in the yard and recreation, Graham was verbally harassed by defendants Adams, Ottino, Kimball, and others, who called plaintiff a "homo" or "fag" and make "gay" or life gender jokes in his presence.

Allegations of verbal abuse or threats, unaccompanied by injury or damage, are not cognizable under § 1983, regardless of whether the inmate is a pretrial detainee or sentenced prisoner. See Jean-Laurent v. Wilkerson, 438 F. Supp.2d 318, 324-25 (S.D.N.Y. 2006)(pretrial detainee's claim of verbal abuse not cognizable under § 1983 because verbal intimidation did not rise to the level of a constitutional violation); Ramirez v. Holmes, 921 F. Supp. 204, 210 (S.D.N.Y. 1996)(threats and verbal harassment without physical injury or damage not cognizable in

55

claim filed by sentenced inmate under § 1983).  See also Price v.
Lighthart, 2010 WL 1741385 (W.D. Mich. Apr. 28, 2010); Glenn v.
Hayman, 2007 WL 894213, *10 (D.N.J. Mar. 21, 2007); Stepney v.
Gilliard, 2005 WL 3338370 (D.N.J. Dec. 8, 2005)("[V]erbal
harassment and taunting is neither 'sufficiently serious' nor 'an
unnecessary and wanton infliction of pain' under the common
meaning of those terms. 'Verbal harassment or profanity alone ...
no matter how inappropriate, unprofessional, or reprehensible it
might seem,' does not constitute the violation of any federally
protected right and therefore is not actionable under [Section]
1983") (quoting Aziz Zarif Shabazz v. Pico, 994 F. Supp. 460, 474
(S.D.N.Y. 1998), and citing Collins v. Graham, 377 F. Supp.2d
241, 244 (D.Me. 2005)).  See also Moore v. Morris, 116 Fed. Appx.
203, 205 (10th Cir. 2004)(mere verbal harassment does not give
rise to a constitutional violation, even if it is inexcusable and
offensive, it does not establish liability under section 1983),
cert. denied, 544 U.S. 925 (2005); Collins v. Cundy, 603 F.2d
825, 827 (10th Cir. 1979) (dismissing prisoner's claim that
defendant laughed at prisoner and threatened to hang him);
Prisoners' Legal Ass'n v. Roberson, 822 F. Supp. 185, 187-89
(D.N.J. 1993)); Abuhouran v. Acker, 2005 WL 1532496 (E.D. Pa.
June 29, 2005)("It is well established ... that ... verbal
harassment, ... standing alone, do[es] not state a constitutional
claim")(citing Dewalt v. Carter, 224 F.3d 607, 612 (7th Cir.
1999); Williams v. Bramer, 180 F.3d 699, 706 (5th Cir. 1999);
Maclean v. Secor, 876 F. Supp. 695, 698 (E.D.Pa. 1995)).  See

also <u>Oltarzewski v. Ruggiero</u>, 830 F.2d 136, 139 (9th Cir. 1987) (holding that verbal harassment and abuse are not recoverable under § 1983); <u>Patton v. Przybylski</u>, 822 F.2d 697, 700 (7th Cir. 1987)(holding that racially derogatory remarks, although "unprofessional and inexcusable," are not "a deprivation of liberty within the meaning of the due process clause").

Here, Graham does not allege an accompanying violation that might allow the gender and homophobic slurs to state a separate due process violation or equal protection claim.  At most, Graham alleges that he was humiliated and made to feel like a prisoner, causing him "mental anguish" or "mental torture" as a result of the verbal harassment.  These general allegations of "injury" are nothing more than the mere recitation of a legal conclusion without factual allegations sufficient at this time to support a claim that the defendants were verbally harassing plaintiff as a form of punishment.  Consequently, because the alleged verbal harassment of Graham was not accompanied by any injurious actions - or physical actions of any kind - by the correction officials, Graham fails to state a cognizable § 1983 claim for a violation of his Fourteenth Amendment due process or Fourteenth Amendment equal protection rights, and his claim will be dismissed with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).

F.  <u>Retaliation Claim</u>

Graham also asserts that he was "indirectly threatened" by the NJDHS Administrator that he would be placed on MAP status after he complained about mail and packages being sent to the

Avenel facility.  He further claims that his therapist Vega
threatened to put Graham on MAP status if Graham does not follow
the NJDHS "way" and after Graham had told another NJDHS staff
member that his family was his own business.  Finally, Graham
alleges that defendant, SCO K. Miller, told two other residents
that Graham was responsible for having the work benches taken out
of the yard area, in retaliation for Graham having filed a
lawsuit against Miller's co-workers.

"Retaliation for the exercise of constitutionally protected
rights is itself a violation of rights secured by the
Constitution ... ."  White v. Napoleon, 897 F.2d 103, 111-12 (3d
Cir. 1990).  To prevail on a retaliation claim, plaintiff must
demonstrate that (1) he engaged in constitutionally-protected
activity; (2) he suffered, at the hands of a state actor, adverse
action "sufficient to deter a person of ordinary firmness from
exercising his [constitutional] rights;" and (3) the protected
activity was a substantial or motivating factor in the state
actor's decision to take adverse action.  Rauser v. Horn, 241
F.3d 330, 333 (3d Cir. 2001) (quoting Allah v. Seiverling, 229
F.3d 220, 225 (3d Cir. 2000)).  See also Anderson v. Davila, 125
F.3d 148, 160 (3d Cir. 1997) (citing Mt. Healthy City Sch. Dist.
Bd. of Educ. v. Doyle, 429 U.S. 274 (1977)); Thaddeus-X v.
Blatter, 175 F.3d 378, 386-99 (6th Cir. 1999), cited with
approval in Allah, 229 F.3d at 225.

This Court finds that the allegations of the Complaint and
addendums are insufficient to state a claim of retaliation.

Graham has not shown that he was engaging in a constitutionally protected activity that was the substantial or motivating factor in the defendants' decision to take adverse action.  The allegations of the Complaint also fail to show that Graham has suffered adverse action sufficient to deter him from exercising his constitutional rights.  He continues to file grievances, as well as civil complaints in this Court, and he has not yet been placed on MAP status because of this activity.  Moreover, by Graham's own admission, the alleged "threats" of MAP status have been more consistently in response to Graham's contumacious refusal to comply with his treatment program at the EJSP-STU. Rather, it is plain that Graham's allegations are nothing more than a recitation of "labels and conclusions" or the "formulaic recitation of the elements of a cause of action" of retaliation, which is not sufficient to support such a claim of constitutional deprivation.  Iqbal, 129 S.Ct. at 1949.  He has shown no correlation between his grievances and complaints filed and purported adverse action.  Indeed, as noted above, Graham has not yet been placed on MAP status, and his treatment restrictions are based on his treatment refusals and not on any constitutionally protected activity.  Therefore, Graham's claim of retaliation will be dismissed with prejudice for failure to state a claim upon which relief may be granted.

G.   Claim Against Public Advocacy Attorney

     Graham also complains that his public advocacy attorney prevented plaintiff from being released to an outpatient program

by stopping a staff psychologist to testify in court.  The staff psychologist allegedly told Graham "off the record' that Graham "does not belong" at the EJSP-STU.  Graham filed an attorney ethics grievance.

It appears that Graham may be asserting an ineffective assistance of counsel claim, as well as seeking his release from the EJSP-STU.  Graham's potential ineffective assistance of counsel claim against his assigned counsel is not actionable at this time in a § 1983 action.  First, assigned counsel is not subject to liability under § 1983 because the attorney is not a state actor.  See Polk Co. v. Dodson, 454 U.S. 312, 325 (1981) (a public defender performing a lawyer's traditional functions as counsel to a defendant, such as determining trial strategy and whether to plead guilty, is not acting under color of state law); Thomas v. Howard, 455 F.2d 228 (3d Cir. 1972) (court-appointed pool attorney does not act under color of state law).  Even if assigned counsel was a privately retained lawyer, counsel would not be subject to liability under § 1983.  Steward v. Meeker, 459 F.2d 669 (3d Cir. 1972) (privately-retained counsel does not act under color of state law when representing client).

Moreover, even if Graham had pleaded facts establishing that his attorney was acting under color of state law, any claim concerning a violation of plaintiff's right to effective assistance of counsel must first be raised in plaintiff's ongoing state civil commitment proceedings.  A federal court generally will not intercede to consider issues that the plaintiff has an

opportunity to raise before the state court.  See Younger v.
Harris, 401 U.S. 37 (1971).

To the extent that Graham's civil commitment proceedings are
no longer pending, and his continued civil commitment has been
adjudicated, which is not apparent from the Complaint and
numerous addendums, any claim of ineffective assistance of
counsel in this regard must first be exhausted via state court
remedies, *i.e.*, by direct appeal or other available state court
review; and then, if appropriate, by filing a federal habeas
application, under 28 U.S.C. § 2254, to assert any violations of
federal constitutional or statutory law, namely, his claim of
ineffective assistance of counsel.  Preiser v. Rodriguez, 411
U.S. 475 (1973).

Therefore, plaintiff's claim against counsel asserting any
liability under § 1983, if alleged, must be dismissed for failure
to state a claim at this time, pursuant to 28 U.S.C. §
1915A(b)(1).

H.  Preliminary Injunction

Finally, Graham brings an application for a preliminary
injunction to prevent defendants from retaliating against him by
confiscating his legal materials or placing him in MAP for
bringing this action.

To secure the extraordinary relief of a preliminary
injunction or TRO, plaintiff must demonstrate that "(1) he is
likely to succeed on the merits; (2) denial will result in
irreparable harm; (3) granting the injunction will not result in

61

irreparable harm to the defendants]; and (4) granting the injunction is in the public interest." <u>Maldonado v. Houston</u>, 157 F.3d 179, 184 (3d Cir. 1998), <u>cert. denied</u>, 526 U.S. 1130 (1999)(as to a preliminary injunction); <u>see also</u> <u>Ballas v. Tedesco</u>, 41 F. Supp.2d 531, 537 (D.N.J. 1999) (as to temporary restraining order).  A plaintiff must establish that all four factors favor preliminary relief.  <u>Opticians Ass'n of America v. Independent Opticians of America</u>, 920 F.2d 187 (3d Cir. 1990). The standards for a permanent injunction are essentially the same as for a preliminary injunction, except that the plaintiff must show actual success on the merits, not a likelihood of success, to obtain a permanent injunction.  <u>See</u> <u>University of Texas v. Camenisch</u>, 451 U.S. 390, 392 (1981).

Here, the claims asserted in this Complaint are being dismissed for failure to state a claim.  Accordingly, Graham has not alleged facts sufficient to satisfy the first requirement that he may be likely to succeed on the merits.  Moreover, Graham fails to articulate irreparable harm, and thus, cannot satisfy the second mandatory requirement.

Therefore, because Graham is unable to establish all four factors necessary for preliminary injunctive relief as required, his application for preliminary injunctive relief must be denied. Additionally, Graham's application for appointment of counsel will be denied as moot because the action is being dismissed for failure to state a claim.

V.   <u>CONCLUSION</u>

For the reasons set forth above, plaintiff's Complaint will be dismissed with prejudice, in its entirety as against all named defendants, for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).  Finally, his application for a preliminary injunction (docket entry no. 3), and his application for appointment of counsel (docket entry no. 15), will be denied as moot because the action is being dismissed for failure to state a claim.  An appropriate order follows.


                    s/ Stanley R. Chesler
                    STANLEY R. CHESLER
                    United States District Judge

63